IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ERIE DIVISION

| | |
|---|---|
| ANTHONY HAMMOND MURPHY,<br><br>　　　　　　　Plaintiff,<br><br>　v.<br><br>THE TJX COMPANIES, INC.,<br><br>　　　　　　　Defendant. | Civil Action No. 1:21-CV-156<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Anthony Hammond Murphy ("Murphy" or "Plaintiff") brings this action against Defendant The TJX Companies, Inc. ("T.J. Maxx" or "Defendant"), and makes the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge:

**NATURE AND SUMMARY OF THE ACTION**

1. Murphy is blind[1] and is therefore a member of a protected class under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102(2), and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 *et seq*.

2. As a result of his blindness, Murphy relies on screen access software to access digital content, like a text message, an email, a website, or a mobile application.

3. Defendant is a retailer that advertises, offers, and sells clothing, shoes, accessories, home goods, cosmetics, toys, and more, as well as related services, to the public.

---

[1] Murphy uses the word "blind" to describe individuals who have substantially limited eyesight. This includes individuals who have no vision or who have low vision.

1

4. Consumers may access Defendant's goods and services at: physical retail stores that Defendant owns, operates, and/or controls; physical offices that Defendant owns, operates, and/or controls; and/or physical manufacturing facilities that Defendant owns, operates, and/or controls.

5. Defendant owns, operates, and/or controls at least one physical retail store at 2070 Interchange Road, Erie, PA 16565.

6. Upon information and belief, Defendant also owns, operates, and/or controls physical offices and/or physical manufacturing facilities.

7. Defendant provides in-person and remote access to its physical retail stores, and provides remote access to its physical offices and physical manufacturing facilities.

8. To facilitate remote access to all its physical facilities, Defendant employs a website, located at https://tjmaxx.tjx.com/ (the "Digital Platform").

9. The public may use the Digital Platform to, among other things, purchase goods that are manufactured, stored, and/or shipped directly from Defendant's physical facilities, and access services that are provided at Defendant's physical facilities, such as the services provided by the customer service and shipping teams located at Defendant's physical facilities.

10. The public may also use the Digital Platform's interactive "store locator" function to locate the physical retail stores at which Defendant provides its goods and services. This interactive functionality serves as a type of advertising directing consumers to locations within Pennsylvania to purchase Defendant's products.

11. This action arises from Defendant's failure to make the Digital Platform compatible with screen access software, thereby denying Murphy full and equal access to Defendant's physical facilities and the goods and services provided at Defendant's physical facilities.

12. Murphy brings this action to ensure full and equal access to Defendant's physical facilities and the goods and services provided at Defendant's physical facilities going forward.

## JURISDICTION AND VENUE

13. The claims alleged arise under Title III such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

14. Defendant attempts to and does participate in the Commonwealth's economic life by advertising, offering, and selling goods and services from its physical facilities to Pennsylvania residents, including Murphy.[2]

15. Defendant facilitates these interactions through the Digital Platform, which involves and requires Defendant's knowing and repeated transmission of computer files over the internet into Pennsylvania.

16. To this end, upon information and belief, Defendant places cookies on computers and other electronic devices physically located in Pennsylvania.[3]

---

[2] *See Gniewkowski v. Lettuce Entertain You Enters.*, No. 2:16-cv-1898-AJS, Order, ECF 123 (W.D. Pa Apr. 25, 2017), *clarified by Order of Court*, ECF 169 (W.D. Pa. June 22, 2017) (Judge Schwab) (*citing Zippo Mfg. Co. v. Zippo Dot Com, Inc*., 952 F. Supp. 1119 (W.D. Pa. 1997) (exercising specific personal jurisdiction over forum plaintiff's website accessibility claims against out-of-forum hotel operator)); *Law School Admission Council, Inc. v. Tatro*, 153 F. Supp. 3d 714, 720-21 (E.D. Pa. 2015) (exercising personal jurisdiction over out-of-forum website operator); *Access Now Inc. v. Otter Products, LLC*, 280 F. Supp. 3d 287 (D. Mass. 2017) (exercising personal jurisdiction over forum plaintiff's website accessibility claims against out-of-forum website operator); *Access Now, Inc. v. Sportswear, Inc*., 298 F. Supp. 3d 296 (D. Mass. 2018) (same).

[3] A. Benjamin Spencer, *Jurisdiction and the Internet: Returning to Traditional Principles to Analyze Network-Mediated Contacts*, 2006 U. Ill. L. Rev. 71, 95 n.156 (2005), http://illinoislawreview.org/wp-content/ilr-content/articles/2006/1/Spencer.pdf (citations omitted) ("A cookie is a message given by a Web server to a computer's Web browser. The primary purpose is to identify users and prepare customized Web pages for them. A persistent cookie is 'a cookie that is stored on a user's hard drive until it expires . . . or until the user deletes the cookie. Persistent cookies are used to collect identifying information about the user, such as Web surfing behavior or user preferences for a specific Web site.'").

17. Murphy was injured when he used the Digital Platform from Erie, Pennsylvania to remotely access Defendant's physical facilities, and the goods and services that Defendant offers to the public from its physical facilities.

18. Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the acts and omissions giving rise to Murphy's claims occurred.

## PARTIES

19. Murphy is a natural person over the age of 18 and is blind.

20. He resides in and is a citizen of Erie, Pennsylvania, located in Erie County.

21. He graduated from Edinboro University with a degree in sociology in 1999 and today he works for the Commonwealth of Pennsylvania.

22. Murphy has advocated for blind individuals his entire life.[4]

23. The United States District Court for the Western District of Pennsylvania has appointed Murphy to represent classes in class actions similar to this individual action.[5]

24. Defendant is a Delaware corporation with a principal place of business in Massachusetts.

25. Defendant is a "public accommodation" within the meaning of Title III of the ADA because Defendant is a "sales establishment" that offers goods and services to the public from

---

[4] *How did Erie plow crews do?: Your view from Facebook*, GoErie.com (Jan. 7, 2018), https://www.goerie.com/opinion/20180107/how-did-erie-plow-crews-do-your-view-from-facebook ("Anthony Hammond Murphy: As a visually impaired person, I find it very difficult to cross streets via curb cuts due to the snow and ice being plowed into these corners. The plow drivers should be allowed to triangulate and get the corners as well, and not just go north-south and east-west.").

[5] *See Murphy v. Le Sportsac, Inc.*, No. 1:22-cv-00058, Doc. 57 (W.D. Pa. July 6, 2023); *Murphy v. The Hundreds Is Huge, Inc.*, No. 1:21-cv-00204, 2022 U.S. Dist. LEXIS 211942 (W.D. Pa. Nov. 17, 2022); and *Murphy v. Eyebobs, LLC*, No. 1:21-cv-00017, Doc. 49 (W.D. Pa. Feb. 9, 2022).

physical facilities that Defendant owns, operates, and/or controls, including physical retail stores, physical offices, and physical manufacturing facilities.[6]

26. Defendant's physical facilities are open to the public, as Defendant allows the public to access its physical retail stores in person and remotely through the Digital Platform, and allows the public to access its physical offices and physical manufacturing facilities remotely through the Digital Platform.

## STANDING UP FOR TITLE III OF THE ADA

27. "Congress passed the ADA in 1990 to fix a serious problem—namely, the seclusion of people with disabilities resulting in explicit and implicit discrimination. . . . The disabled population hoped that, as a result of the ADA, their lives would no longer be shaped by limited access and the inability to choose. . . . However, reality—a lack of compliance with the ADA and severe underenforcement of the statute—soon destroyed this hope."[7]

28. More than thirty years "after the passage of the ADA, numerous facilities are still not compliant leaving the disabled population in a second-class citizenship limbo. Title III of the ADA allows both the U.S. Attorney General[8] and private individuals[9] to sue, but the rate at which

---

[6] 42 U.S.C. § 12181(7)(E).

[7] Kelly Johnson, *Testers Standing up for the Title III of the ADA*, 59 Cas. W. Res. L. Rev. 683, 684 (2009), http://scholarlycommons.law.case.edu/caselrev/vol59/iss3/6 (*citing* H.R. REP. No. 101-485, pt. 2, at 28-29 (1990); Elizabeth Keadle Markey, *The ADA's Last Stand?: Standing and the Americans with Disabilities Act*, 71 Fordham L. Rev. 185 (2002) (arguing for a more lenient standard for standing under the ADA); and Samuel R. Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 UCLA L. Rev. 1, 3 (2006) (discussing the need for private enforcement in Title III)).

[8] 42 U.S.C. § 12188(b).

[9] 42 U.S.C. § 12188(a).

[ ] the Attorney General [is] bringing suit seeking compliance is extremely low. The Department of Justice's Disability Section, tasked with ADA enforcement, is understaffed[.]"[10]

29. Thus, "private suits by necessity represent the main tool for ensuring compliance with Congress' intent in passing the ADA,"[11] most of which suits "are brought by a small number of private plaintiffs who view themselves as champions of the disabled."[12]

30. The U.S. Department of Justice ("DOJ") supports this dynamic, recognizing that because it "cannot investigate every place of public accommodation," "[p]rivate plaintiffs play an important role in enforcing the ADA[.]"[13]

31. Consistent with these policies, Murphy files this case to ensure Defendant provides full and equal access to the goods and services that Defendant offers to the public from its physical facilities.

## SUBSTANTIVE ALLEGATIONS

32. Screen reader auxiliary aids allow blind persons to use websites and mobile apps to remotely access physical facilities, and the goods and services retailers provide at those physical facilities.

33. Two of the most commonly used aids are JAWS from Freedom Scientific (available on Windows computers), and VoiceOver (available on macOS and iOS devices).

---

[10] Johnson, *supra* note 8.

[11] *Betancourt v. Ingram Park Mall*, 735 F. Supp. 2d 587, 596 (W.D. Tex. 2010).

[12] *Id.* (quoting *Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007)); *D'Lil v. Best Western Encina Lodge & Suites*, 538 F.3d 1031, 1040 (9th Cir. 2008) (same).

[13] Statement of Interest of the United States of America, *ERC v. Abercrombie & Fitch Co.*, No. 1:09-cv-03157 (D. Md.), ECF No. 38, at *1 (July 6, 2010); *See also Hensley v. Eckerhart*, 461 U.S. 424, 445 (1983) ("All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.").

34. "JAWS, Job Access With Speech, is the world's most popular screen reader, developed for computer users whose vision loss prevents them from seeing screen content or navigating with a mouse. JAWS provides speech and Braille output for the most popular computer applications on your PC. You will be able to navigate the Internet, write a document, read an email and create presentations from your office, remote desktop, or from home."[14]

35. "VoiceOver is an industry-leading screen reader that tells you exactly what's happening on your device. VoiceOver can now describe people, objects, text, and graphs in greater detail than ever. Auditory descriptions of elements help you easily navigate your screen through a Bluetooth keyboard or simple gestures on a touchscreen or trackpad. And with unique rotor gestures that function like a dial on touchscreens and trackpads, you can make content such as websites a breeze to browse."[15]



---

[14] *JAWS®*, Freedom Scientific, https://www.freedomscientific.com/products/software/jaws/ (last accessed May 20, 2024).

[15] *See Accessibility*, Apple, https://www.apple.com/accessibility/vision/ (last accessed May 20, 2024).

36. The images to the right show a retailer successfully coding its website so that blind shoppers can remotely access physical facilities, and the goods and services provided at those physical facilities.[16]



37. The first image illustrates what shoppers perceive visually when browsing the retailer's website with an iPhone. The second image shows the audio description highlighted for that image in green.

38. Although invisible to the eye, screen access software reads the highlighted text of the second image aloud to describe that image to shoppers who cannot perceive content visually.

39. In this example, when a screen reader user tabs to the image file, the website announces, "[o]ne burlap and cotton tote bag with a custom printed architectural company logo."

40. Blind shoppers require audio descriptions, frequently called "alternative text," like this to access physical facilities and the goods and services provided at physical facilities.

41. Unfortunately, because of Defendant's failure to build the Digital Platform in a way that is compatible with screen access software, Murphy is unable to remotely access Defendant's physical facilities, or the goods and services Defendant provides at its physical facilities.

---

[16] *See* Custom Ink, Homepage, https://www.customink.com/ (last accessed Mar. 28, 2019).

42.     For example, from visiting the Digital Platform in April and May 2024, and from investigations performed on his behalf at that time, Murphy found he could not fully and equally access Defendant's physical facilities, or the goods and services provided at those facilities. For example:

(a)     Defendant prevents screen reader users, like Plaintiff, from accessing various goods and services at Defendant's physical facilities, including purchasing services that are maintained by employees working at Defendant's physical facilities. For example, consumers who perceive content visually will see red error indicators on the Digital Platform when they fail to select the size of the product they wish to purchase. These consumers can scroll up the page to provide the missing selection indicated in red. Unfortunately, Defendant fails to redirect screen reader users to the error indicators when appropriate, thereby denying screen reader users, including Plaintiff, access to these purchasing services. As a result, Plaintiff is less likely to resolve any errors and complete the online form successfully. Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/932247605/3154c9d43e?share=copy.

(b)     Defendant prevents screen reader users, like Plaintiff, from accessing various goods and services at Defendant's physical facilities, including services that communicate the selections a consumer makes during the buying process, which services are maintained by employees working at Defendant's physical facilities. For example, Defendant allows consumers to select the size of the product they wish to purchase. Defendant identifies the selected size visually by shading in black the shopper's selection. Unfortunately, Defendant fails to include alternative text to identify selections in a non-visual means, thereby denying screen reader users, including Plaintiff, access to this service that Defendant makes available through the employees at

its physical facilities. Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/932248566/d405205428?share=copy.

        (c)    Defendant prevents screen reader users, like Plaintiff, from accessing various goods and services at Defendant's physical facilities, including services that communicate a consumer has placed an item located at Defendant's physical facilities in the consumer's digital shopping cart, which services are maintained by employees working at Defendant's physical facilities. To this end, consumers who perceive content visually will notice a pop-up window after placing an item in their shopping cart. This pop-up window confirms the shopper placed the item in their shopping cart successfully and asks consumers whether they would like to checkout. Unfortunately, Defendant denies screen reader users, including Plaintiff, access to this service by failing to notify them when these pop-up windows appear. As a result, screen reader users must tab back to the top of a webpage to complete a purchase. This burdensome, backward, and confusing interaction makes it more likely that Plaintiff and other blind shoppers will abandon the items in their shopping cart and leave the Digital Platform before completing a purchase. Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/932250298/e530e4287d?share=copy.

        (d)    Defendant prevents screen reader users, like Plaintiff, from accessing various goods and services at Defendant's physical facilities, including services that allow consumers to access different categories of products located at Defendant's physical facilities, which services are provided by employees working at Defendant's physical facilities. For example, consumers who perceive content visually will likely recognize the Digital Platform's menu icon, which consumers may click to view and navigate to various sections of the website. Unfortunately, Defendant denies screen reader users, including Plaintiff, access to this service because this icon

is not labeled with sufficiently descriptive alternative text. As a result, Plaintiff is unlikely (or unable) to locate the menu independently, making it less likely he uses this important navigational tool. Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/932250808/849d9d46bf?share=copy.

(e) Defendant prevents screen reader users, like Plaintiff, from accessing various goods and services at Defendant's physical facilities, including pricing and promotional services that are provided by employees working at Defendant's physical facilities. For example, consumers who perceive content visually will notice that many products available for purchase through the Digital Platform include two prices. One price—a higher price—appears in strikethrough font. The other—a lower price—does not. Consumers who perceive content visually will understand that the price appearing in strikethrough font is the "old" or "original" price, while the price appearing in regular font is the "new" or "sale" price. Unfortunately, Defendant denies screen reader users, including Plaintiff, access to these pricing and promotional services because screen readers cannot identify the meanings of these two fonts so that users can make an informed decision. Instead, Defendant announces two prices for the same product, making it difficult for consumers to determine with certainty what they signify, like different quantities, conditions, sizes, or in this case, sales. This unnecessary confusion frustrates Plaintiff's ability to make informed purchasing decisions and increases the odds he will abandon the purchase process without making a selection at all. Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/932251042/c625317de0?share=copy.

43. The access barriers described above, and others, denied and continue to deny Murphy full and equal access to Defendant's physical facilities and the goods and services provided at Defendant's physical facilities.

44. These barriers, together with Defendant's insufficient policies and practices giving rise to them, humiliate and deter Murphy from using the Digital Platform in the future to access Defendant's physical facilities and the goods and services provided at Defendant's physical facilities.

45. Still, Murphy intends to return to the Digital Platform within the next six months to determine if it is accessible and, if so, to attempt to access Defendant's physical facilities and the goods and services provided at Defendant's physical facilities at that time.

## SUBSTANTIVE VIOLATION

### Title III of the ADA, 42 U.S.C. § 12181 *et seq*.

46. The assertions contained in the previous paragraphs are incorporated by reference.

47. Murphy is a person with a "disability." 42 U.S.C. §§ 12102(1)(A), 12102(2)(A).

48. Defendant is a "public accommodation." 42 U.S.C. §§ 12181(7)(E), (F).

49. Defendant violated the ADA by, among other things, denying Murphy the full and equal enjoyment of goods, services, facilities, privileges, advantages, or accommodations; denying Murphy an opportunity to participate in or benefit from goods, services, facilities, privileges, advantages, or accommodations; providing Murphy an unequal opportunity to participate in or benefit from goods, services, facilities, privileges, advantages, or accommodations; and excluding Murphy, denying him services, and treating him differently than others because of the absence of auxiliary aids and services, or the failure to modify policies and practices. 42 U.S.C. §§ 12182(a), 12181(b)(1)(A)(i), 12181(b)(1)(A)(ii), 12182(b)(2)(A)(ii), 12182(b)(2)(A)(iii).

50. These violations denied Murphy access to Defendant's physical facilities and the goods and services provided at Defendant's physical facilities.

51. These violations also humiliate Murphy and deter him from attempting to use the Digital Platform to gain access to Defendant's physical facilities and the goods and services provided at Defendant's physical facilities, thereby forcing Murphy to access Defendant's physical facilities in-person or wait until Defendant elects to retrofit the Digital Platform to be accessible.

## PRAYER FOR RELIEF

WHEREFORE, Murphy requests judgment as follows:

(A) A declaratory judgment that at the commencement of this action Defendant was in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, in that Defendant took insufficient action to ensure Murphy could use the Digital Platform to fully, equally, and independently access Defendant's physical facilities and the goods and services provided at Defendant's physical facilities;

(B) A permanent injunction under 42 U.S.C. § 12188(a)(2) and 28 CFR § 36.504(a) which directs Defendant to take all steps necessary to ensure Defendant's physical facilities and the goods and services provided at Defendant's physical facilities are fully, equally, and independently accessible to Murphy by the Digital Platform, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that Defendant has adopted and is following policies and practices that will cause Defendant to remain in compliance with the law—the specific injunctive relief requested by Plaintiff is described more fully below;

(1) Within 60 days of the Court's order, Defendant shall designate a team of its employees and/or contractors as the Accessibility Coordination Team for the Digital Platform;

(2) Within 90 days of the Court's order, Defendant shall appoint or retain an Accessibility Consultant who is knowledgeable about digital accessibility, the ADA, and the Web Content Accessibility Guidelines 2.1 A/AA, developed by the W3C and available at

https://www.w3.org/TR/WCAG21/. The Accessibility Consultant's duties shall include assisting Defendant in ensuring the Digital Platform conforms with Web Content Accessibility Guidelines 2.1 A/AA, and provides effective communication to screen reader users.

(3)     Within 120 days of the Court's order, Defendant shall develop and implement an Accessibility Strategy designed to ensure the Digital Platform conforms with Web Content Accessibility Guidelines 2.1 A/AA, and provides effective communication to screen reader users within 18 months of the Court's order.

(4)     Within 120 days of the Court's order, Defendant shall develop and publish an Accessibility Statement that advises visitors that Defendant is making efforts to ensure that its Digital Platform conforms with Web Content Accessibility Guidelines 2.1 A/AA, and provides effective communication to screen reader users, and includes an Accessibility Feedback Form that encourages visitors to provide feedback to help improve the accessibility of the Digital Platform. Defendant shall add a link at the beginning of all Digital Platform's landing pages, directing screen reader users to the Accessibility Statement. Defendant shall have the option to make this link invisible to customers who do not use screen readers.

(5)     Within 150 days of the Court's order, Defendant shall ensure its customer service personnel are trained to assist individuals with disabilities (including individuals who are Blind and/or who have a Visual Disability) who encounter difficulties using the Digital Platform and to timely assist such individuals within published hours of operation

(6)     Within 180 days of the Court's order, Defendant shall modify its existing bug fix policies, practices, and procedures to include the elimination of bugs that cause the Digital Platform to fail to provide effective communication to screen reader users. Defendant shall ensure that any bugs that cause the Digital Platform to fail to provide effective communication to screen

reader users are remedied with the same level of priority (e.g., speed, resources used to remedy, etc.) as any other equivalent loss of function for individuals who are not blind.

(7) Within 210 days the Court's order, Defendant shall train all employees responsible for website or mobile application design, development, or maintenance to ensure the future design, development, and maintenance of the Digital Platform conforms with Web Content Accessibility Guidelines 2.1 A/AA, and provides effective communication to screen reader users. Defendant shall provide accessibility training to all newly-hired employees responsible for website or mobile application design, development, or maintenance within the latter of 210 days of the Court's order or 90 days of their hire date. Commencing in 24 months of the Court's order, Defendant shall ensure that all then-current employees responsible for website or mobile application design, development, or maintenance are provided with refresher accessibility training at regular intervals that shall not exceed two years.

(8) Until furthered ordered by the Court, Defendant or its Accessibility Consultant shall perform an automated accessibility audit on at least a monthly basis to evaluate whether the Digital Platform conforms with Web Content Accessibility Guidelines 2.1 A/AA, and provides effective communication to screen readers. The monthly accessibility audit shall be conducted using the WAVE Web Accessibility Evaluation Tool (https://wave.webaim.org), the enterprise level Pope Tech automated testing tool (https://pope.tech), or similar tool approved by Plaintiff. At minimum, the monthly accessibility audit shall include each home or landing page of the Digital Platform, and a sampling of web pages that visitors would access to (a) perform a search, (b) view a product, (b) complete a purchase, and (d) contact customer service.

(9) Until furthered ordered by the Court, Defendant or its Accessibility Consultant shall perform end-user accessibility/usability testing on at least a quarterly (four times

per year) basis to evaluate whether the Digital Platform conforms with Web Content Accessibility Guidelines 2.1 A/AA, and provides effective communication to screen readers. At minimum, the quarterly end-user accessibility test shall include each home or landing page of the Digital Platform, as well as a sampling of web pages that that visitors would access to (a) perform a search, (b) view a product, (b) complete a purchase, and (d) contact customer service.

(10)   Until furthered ordered by the Court, for each new, renewed, or renegotiated contract with a vendor of third-party content, Defendant shall seek a commitment from the vendor to provide content that conforms with Web Content Accessibility Guidelines 2.1 A/AA, and provides effective communication to screen readers.

(11)   Defendant shall provide Plaintiff, through his counsel, with a report on the first, second, and third anniversaries of the Court's Order which summarizes the progress Defendant is making in meeting its obligations.

(C)   Payment of actual, statutory, nominal, and other damages, as the Court deems proper;

(D)   Payment of costs of suit;

(E)   Payment of reasonable attorneys' fees under 42 U.S.C. § 12205 and 28 CFR § 36.505, including costs to monitor Defendant's compliance with the judgment;[17]

---

[17] *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 559 (1986), *supplemented*, 483 U.S. 711 (1987); *People Against Police Violence v. City of Pittsburgh*, 520 F.3d 226, 235 (3d Cir. 2008) ("This Court, like other Courts of Appeals, allows fees to be awarded for monitoring and enforcing Court orders and judgments."); *Gniewkowski v. Lettuce Entertain You Enterprises, Inc.*, No. 2:16-cv-01898-AJS (W.D. Pa. Jan. 11, 2018) (ECF 191); *Access Now, Inc. v. Lax World, LLC*, No. 1:17-cv-10976-DJC (D. Mass. Apr. 17, 2018) (ECF 11); Amended Order Granting In Part Plaintiffs' Motion For Attorneys' Fees And Costs; Denying Administrative Motion To Seal, *National Federation of the Blind of California v. Uber Technologies, Inc.*, No. 14-cv-04086-NC (N.D. Cal. Nov. 8, 2019), https://rbgg.com/wp-content/uploads/NFB-v-Uber-Amended-Order-Granting-In-Part-Pltfs-Motion-for-Attys-Fees-and-Costs-11-08-19.pdf (last

(F) Whatever other relief the Court deems just, equitable and appropriate; and

(G) An order retaining jurisdiction over this case until Defendant has complied with the Court's orders.

Dated: JUNE 3, 2024  /s/ Lawrence H. Fisher

Lawrence H. Fisher
Pa. No. 67667
One Oxford Centre
301 Grant Street, Suite 270
Pittsburgh, PA 15219
Tel. (412) 577-4040
lawfirst@lawrencefisher.com

*Attorney for Plaintiff*

---

accessed May 20, 2024) (finding plaintiffs "are entitled to reasonable attorneys' fees incurred in connection with monitoring [defendant's] compliance with the Settlement" of a Title III ADA case).